UNITED STATES FIDELITY & GUARANTY COMPANY *v.* SMITH

No. 43077          May 25, 1964          164 So. 2d 462

*Brewer, Brewer & Luckett,* Clarksdale, for appellant.

*Breland & Whitten,* Sumner, for appellee.

BRADY, TOM P., J.

This is an appeal by the United States Fidelity & Guaranty Company from a judgment in the principal amount of $10,000, with interest, based upon a jury verdict and a judgment obtained in the Circuit Court of the Second Judicial District of Tallahatchie County, Mississippi, on March 7, 1963.

The appellee filed her declaration against the appellant based upon provisions contained in the comprehensive general automobile liability insurance policy issued to the appellee's deceased husband, Whitney E. Smith. The declaration alleges that the insured died as a result of injuries sustained on the 18th day of September, 1962, when his 1960 Pontiac automobile, which he was driving, collided with a 1957 Ford automobile being driven by Mr. Gentry M. Brannon, Sr., adjacent to the driveway going into Mr. Brannon's home. Mr. Smith received internal injuries from the wreck and, as a proximate result of said injuries, and solely because thereof, he died on the 24th day of September, 1962; and that the death of the insured resulted directly and independently of all other causes from the bodily injuries caused by said accident, and that under the terms of the policy of insurance the appellant is obligated to the appellee in the sum of $10,000, but that appellant has failed to pay same.

The facts in the case are brief and, for the most part, are uncontested. On the 18th day of September,

1962, the insured, Whitney E. Smith, was driving his Pontiac automobile on Mississippi Highway No. 32, about 10:30 in the morning. He was driving behind a 1957 Ford being driven by Mr. G. M. Brannon, Sr., and when the deceased attempted to pass the Ford car being driven by Mr. Brannon, Mr. Brannon simultaneously turned his car to the left in the highway, for the purpose of entering a private driveway on the south side of the highway. The right front part of the Smith Pontiac car struck the Ford car about its left rear door, blowing out the right front tire on the Pontiac, damaging the wheel, and causing the Smith car to leave the road and to run down into a bar pit where it stopped. There was no positive proof as to the speed of the deceased's automobile, but testimony indicates, from the skidmarks made by the deceased's car prior to the collision, the position of the car subsequent to the wreck and the damages done to the car as revealed by the photographs introduced, that there was considerable force involved at the time of the collision. The deceased's car could not move on its own power.

The first person to the scene was Mr. David Rice, who testified that when he arrived the deceased was standing on the gravel driveway, rubbing his chest and, when asked if he was hurt, replied that he didn't think so, that he had received a skinned leg. The deceased, however, appeared to be extremely nervous and upset.

Patrolman Robert R. Sewell testified that when he came to the scene shortly after the collision, Mr. Smith was in shock and was having difficulty in making conversation and was about to have a rigor. Patrolman Sewell tried to get him to go to a doctor but the deceased refused to do so, and the patrolman carried him home.

The record discloses that during the next six days the deceased suffered considerably, complaining of pain in his chest and abdomen; that he had difficulty in getting

his breath and was suffering considerable discomfort and pain.

Dr. Biles of Sumner corroborated the foregoing facts and also testified to the fact that the deceased had developed a blue bruised spot on the upper stomach of his left side. When the deceased's blood pressure dropped appreciably and his pulse and respiration increased, on the morning of September 24th, Dr. Biles immediately referred him to Dr. Meek of Greenwood, and the deceased was rushed to the Greenwood Leflore Hospital, where he died about thirty minutes after being admitted. An autopsy was performed on the deceased by Dr. Daniel Trigg, the pathologist of Greenwood Leflore Hospital. Dr. Meek was present at the time the autopsy was performed. The autopsy revealed fresh, bright blood, which showed that there had been a recent hemorrhage, and there was also observed old blood which had run down into Mr. Smith's abdominal cavity back of his great blood vessel, which showed that he had had blood leaking from his great blood vessel for several days.

The appellee offered ten witnesses, eight of whom were lay witnesses, including the appellee, the investigating patrolman and six friends, who, among other things, testified that prior to the accident the deceased had been a very active man for his age and, as far as they knew, was healthy and led a normal, active life. None of the lay witnesses could know to what degree, if any, the aneurysm, which the autopsy revealed the deceased had, contributed to the deceased's death. No objection is made by the appellant to the lay testimony of these witnesses insofar as the former health and activities of the deceased are concerned. The two other witnesses offered by the appellee were Dr. G. Lacey Biles, the local family physician at Sumner, Mississippi, and Dr. Edwin M. Meek, the family physician at Greenwood. Dr. Biles and Dr. Meek both testified that the

deceased was a normal person for his age. Dr. Biles testified that he had been perhaps a little too active, but that he had slowed down a little and that he was doing the ordinary work of a man of his age. He testified that he saw him the day after the accident; that the deceased was complaining of pain, on deep breathing, in his lower chest, and in the pit of his abdomen to the left side, in the upper part of the stomach. His left chest showed pleurisy or a pleuritic rub. He had a bruise on his upper abdomen or lower chest on the left side, about two inches up and down, and about three inches across. Dr. Biles saw the deceased again on the 22nd, which was four days after his injury, at which time the deceased was not able to have a bowel movement, and had not had any since the time of the accident. On the 24th of September he was called again to the deceased's home around 6:30 in the morning and the deceased was complaining more with his stomach than he was with his chest. Around 8:00 A. M., the deceased's blood pressure dropped from 184/94 to 144/64. His pulse increased from 90 to 110 and his breathing increased from 18 to 24, and Dr. Biles stated that he knew that Mr. Smith was in serious condition. He immediately called Dr. Meek at Greenwood and promptly sent Mr. Smith to the Greenwood Leflore Hospital to Dr. Meek, where he died thirty minutes after being admitted.

An autopsy subsequently performed by Dr. Trigg revealed that the deceased had an aortic aneurysm. The aneurysm was roughly three to four inches in size, and approximately three or four inches from the heart, and had been in existence for some length of time and was ruptured. Dr. Biles was of the opinion that Mr. Smith's death was due to the injuries which he received in the automobile accident. He stated:

"Of course, I didn't know that he had a rupture of his aorta, and I doubt if they knew either, because it

is a little unusual thing. Usually those things are sudden, but from the history before and after, if you want to put it that way, he must have had a pinpoint, real slow, opening in that blood vessel, the aorta.''

In answer to the question of what, in his opinion, caused the opening in the aorta, Dr. Biles testified:

''Well it was definitely a coincidence of the wreck. It was simultaneous. That's what he had at that time.''

The testimony of Dr. Biles also reveals that it was his opinion that the automobile accident tore or caused a small hole in his aorta, which in turn caused a slow leak, and that blood had been leaking from this hole from the time of the accident to the time of his death. Dr. Biles was also of the opinion that except for the accident, Mr. Smith would have lived at least five or six years longer. Dr. Meek, appellee's physician who resides at Greenwood, testified that he was present when the autopsy was performed by Dr. Daniel Trigg; that he observed the fresh, bright blood, which showed that the deceased had had a recent hemorrhage, and the old blood which had run down into the deceased's abdominal cavity; that Mr. Smith had said: ''This pain is about to tear me in two.'' Dr. Meek testified that the old blood was around the nerves which supplied his intestines, paralyzing them so that they did not work after the wreck. Dr. Meek stated that he did not think there was any doubt that the deceased had an injury to his aorta at the time of the accident, which later became larger, and that the deceased bled to death. Dr. Meek stated emphatically:

''I feel very strongly that the accident caused his death, and did at the time. * * * The cause of death was the rupture of an aortic aneurysm due to the accident that he had six days before I saw him.''

Dr. Meek testified that he had no reason to say but that the deceased should have lived several years at least, had he not had the accident. Dr. Trigg, who

performed the autopsy in the presence of Dr. Meek, testified that there were eight findings obtained from the autopsy, four of which related to the immediate cause of Mr. Smith's death, being (1) "dissecting aneurysm of the aorta with rupture"; (2) "* * extreme loss of blood"; (3) "arteriosclerotic cardio-vascular disease"; (4) "contusions — superficial and internal". Dr. Meek stated that these were the four main causes of the death of the deceased. This doctor testified further that the aneurysm was located in the aorta, was approximately three or four inches in diameter, and that it had been there for some time, more likely for years. Dr. Trigg stated that, in his opinion, death would not have occurred in this instance had Mr. Smith had a normal aorta, but with the condition which Mr. Smith had, that his life expectancy would have been less than one year. Dr. Trigg stated that he could not say that Mr. Smith's death was due solely to the result of the automobile accident or solely to the aneurysm; that in his opinion Mr. Smith's death was due to both. Dr. Trigg admitted, however, that there was no evidence of anything else that could have caused the initial rupture of the aorta except the automobile accident, as shown in this testimony:

"Q. Yes, sir. I'm not trying to quibble with you about that, but I am saying the thing that initiated it and set this train of events in action was the accident and the tear there, wasn't it?"

"A. Presuming that the tear was from the accident.

"Q. Yes, of course you don't know that, and I don't either, but there is no evidence that it was from anything else?

"A. That's right."

There is in this case practically the same proof as was introduced in the Mutual Life Ins. Co. of New York v. Smith, 160 So. 2d 203, decided February 10, 1964 and not yet reported in Mississippi Reports. In

the former case, three doctors testified for the appellant, and in the case at bar only one doctor testified. The same two doctors who testified for the appellee in the case at bar testified for the appellees in the Mutual Life Insurance Company of New York case. Appellant cites, for the most part, the same authorities in the case at bar which were cited by the appellant in its brief of the Mutual Life Insurance Company of New York case. Appellee contends, therefore, that the decision of this Court in Mutual Life Insurance Company of New York v. Mrs. Leone L. Smith is the controlling law in this case. On the other hand, the appellant seeks to escape liability for the death of the insured on the theory that the death did not result directly and independently of all other causes from bodily injury caused by the accident. The appellant urges further that the deceased's death resulted directly or indirectly from a pre-existing disease or bodily infirmity which, it is claimed, the facts in this case disclose.

The pertinent part of the insurance contract is as follows:

"Coverage A — Death Benefit

"To pay the principal sum stated in the schedule in the event of the death of the Insured which shall result directly and independently of all other causes from bodily injury caused by accident and sustained by the Insured while in or upon or while entering into or alighting from, or through being struck by, an automobile, provided the death shall occur (1) within ninety days after the date of the accident, or (2) within fifty-two weeks after the date of the accident and during a period of continuous total disability of the Insured for which weekly indemnity is payable under the Total Disability Coverage."

The basic question of whether, under the facts and the provisions of the policy, Smith's death was directly caused by the injuries he sustained in the accident,

independently of all other causes, the appellant urges should be answered in the negative. As a leading authority the appellant urges that on April 16, 1963, this Court handed down an eminently correct decision in the case of Mutual of Omaha Insurance Co. v. Deposit Guaranty Bank & Trust Co., 151 So. 2d 816. The appellant further urges that in that case we were called upon to interpret, construe and apply the law to a policy provision very similar to the one in the case at bar, and that the Mutual of Omaha case should control the instant case. Since the appellant attributes such great importance to this case, it merits careful consideration. The provision of the policy involved in the Mutual of Omaha case is as follows:

"If the Insured shall, through accidental means, sustain bodily injuries as described in the Insuring Clause, which shall, independently and exclusively of disease and all other causes, immediately, continuously and wholly disable the Insured from the date of the accident and result in any of the following specific losses within thirteen weeks, the Association will pay:

"For Loss of Life _____$5,000.00"

Appellant earnestly urges that while the insuring agreement is somewhat different from the agreement in the case at bar, the intent, purpose and import is identical insofar as the question of liability is concerned. While there is some similarity between the agreements, the facts in the Mutual of Omaha case are clearly and sharply distinguishable from those in the case at bar. In the Mutual of Omaha case the insured was involved in an automobile accident on January 25, 1951, and later on December 31, 1961 in a train-automobile collision. On February 11, 1961 he suffered a cardiac attack and X-rays revealed a marked enlargement of the heart. In the Mutual of Omaha case, two medical witnesses for the plaintiff testified that the accident and resulting bodily injury was the proximate, contributing

cause of death, while two doctors for the defendant, as well as the two for the plaintiff, all agreed that the insured's heart disease was active, virulent and progressive, and of a type apt to cause death at any time. The proof showed that he had been in and out of hospitals because of heart condition repeatedly. In that case we held that the insurer was entitled to a directed verdict. We stated, among other things:

"In other words, the most that the medical witnesses for the plaintiff would say was that the accident contributed to the insured's death."

It follows, therefore, in the Mutual of Omaha case, frequently and hereinafter called the Sharon case because Dr. Sharon was the insured, that the proof on behalf of the plaintiff was insufficient to bring the claim within the said provisions of the policy. The facts which distinguish the Sharon case from the one at bar are sure and numerous. In the Sharon case Dr. Sharon was a weak, sickly man, and had been so for some ten years. From the opinion in the Sharon case, we find that there are fourteen specific details which relate to this serious illness which the doctor had, starting in 1949 when angina pectoris was diagnosed, more than ten years before his death. From February 26th to March 7th of 1957, he had an arteria vascular reaction, acute and severe. From February 2nd to the 6th of 1958, he was hospitalized with hypertensive vascular reaction with coronary insufficiency. Later he had a coronary occlusion with complete insufficiency. He was retired in 1958 from the VA for physical reasons related to his heart condition. He retired from the Mississippi State Sanatorium; his private practice was not extensive but restricted. On July 25th to September 2nd, 1960, he was hospitalized for mild cardial infarction. From November 15th to 21st he was again hospitalized for coronary insufficiency. On January 25, 1961 he sustained an automobile accident. On February

11, 1961 he had a cardiac attack with marked enlargement of the heart. In February of 1961 he was in constant danger of thrombosis with active heart disease, the type apt to cause death at any time. On December 31, 1961 he was involved in an automobile-train accident and his death occurred some thirty-six days thereafter. It appears, therefore, that there was very little, if any, substantial proof in the Sharon case that the accident killed the doctor. In the case at bar, Mr. Smith led a normal life, and had no apparent illness. Mr. Smith's doctors stated positively that the accident did kill him. In the Sharon case there is no proof that the accident set in motion a series of events leading directly to death, but in the case at bar, all the medical evidence was to this effect. In the Sharon case, disease was the proximate cause of death, and in the case at bar it was the accidental injuries which caused the lesion and which in turn caused the hemorrhages, slow, of course, but which ultimately led to the death, and were the proximate cause thereof. Under the rule of proximate and remote causes herein discussed, it was inevitable that the Sharon case be decided as it was decided.

Appellant finally submits that in the case at bar the insured and the insurer had a meeting of the minds as shown by the pertinent insuring clause, when the insured purchased the policy and that it was explicitly and unequivocally in the insuring agreement that there would be no liability on the insurer unless the accidental death resulted directly and independently of all other causes from bodily injury caused by accidental means. Citing Cornelius on Insurance, Accidental Means, page 112, appellant also urges that to let the verdict of the lower court stand would be tantamount to overruling the Sharon case, and this court's approval of the citation from Cornelius on Insurance, Accidental Means.

In opposition to the argument and contentions asserted by the appellant, the appellee maintains that

the case of Mutual Life Insurance Company of New York v. Mrs. Leone L. Smith is and should be considered the controlling case insofar as the liability of the insured in the case at bar is concerned. The appellee concedes that while it is true in a number of jurisdictions, the rule of proximate and remote causes is not applied to the construction of a contractual stipulation in a policy of accident insurance providing, in substance, that there shall be no liability for death unless effected solely through external, violent and accidental means, independently and exclusively of all other causes, and not directly or indirectly by disease or bodily infirmity. Moreover, the appellee also points out that the courts of such other states hold that in these cases the question at issue is not to be decided on the outcome of the inquiry as to whether the injury is a proximate cause of the death, but Mississippi is not among these jurisdictions. In this state the rule of proximate and remote causes is applied to the construction of such contractual stipulations. In this state there is liability under a policy of accident insurance containing a contractual stipulation to the effect that there shall be no liability for death unless caused independently and exclusively of all other causes, by accidental injury, and not directly or indirectly by disease or bodily infirmity, if the accidental injury is the proximate cause of the death. This rule, of course, is applicable to the policy containing the provision above quoted in the case at bar.

Therefore, we now come to the fundamental basic question, insofar as the application of the Mississippi rule is concerned, and that question is: Did the accident which the deceased incurred on the 18th day of September constitute the proximate cause of his death? If this question can be answered in the affirmative, then the Mississippi rule will apply, provided the rule is not affected by the decision in the Sharon case. The

basic case upon which all of the Mississippi cases rest and all other cases decided in accordance with the Mississippi rule of the proximate cause, is the old case of U. S. Fidelity & Guaranty Co. v. Hood, 124 Miss. 548, 87 So. 115, decided in 1920. In that case the medical testimony indicated that Mr. Hood was affected with high blood pressure and some kidney trouble. While the policy was in force and effect, and when Hood was fifty-six years of age, he slipped while walking in his back yard, striking his head on the frozen ground. He remained at his home for the next week, was carried to the hospital on December 19th, with his death following on December 27th, 1917, some fifteen days following the accident. The doctors testified that the accident operated upon the diseased condition which he had, namely, high blood pressure and kidney trouble, and that the accident was the primary cause of the insured's death, his death being caused by the fall accompanied by uremia. Dr. Lewis, a physician who also attended Hood, likewise said that his death was caused by the fall and by uremia. Dr. Smythe, the exclusion of whose testimony was complained of on appeal, stated that the condition of high blood pressure and kidney trouble produced the death and that the fall had nothing to do with it. An expert for the insurance company evaluated the evidence and he also stated that the insured's death was caused by his pre-existing diseases and not by his fall. Considering the question at the insistence of the insurance company that the injury was not caused directly and exclusively from all other causes from bodily injury sustained during the life of the policy solely through accidental means, this Court had this to say:

"We think that, if the accident is the proximate cause of the death and sets in motion or starts a latent or dormant disease, and such disease merely contributes to the death after being so precipitated by the accident,

it is not a proximate cause of the death nor a contributing cause within the meaning of the terms of the policy.''

We also quoted, with approval, this language:

''What is the proximate cause of an injury is generally a question for the jury to be determined as a fact in view of all the circumstances of fact attending it; * * * and where, in an action on an accident insurance policy, the evidence tending to show that the death of the decedent was the immediate result of an accident is weak, but it cannot be said that all reasonable men would necessarily conclude that it was not the result of the accident, the case is one for the jury.''

Furthermore, we held that:

''The rule of interpretation of contracts of insurance of all kinds is that, in cases of doubt, that interpretation shall be given which favors the insured rather than the insurer; and this rule has its strongest application in relation to those terms of the policy that would work the forfeiture of a right otherwise maintainable.''

In the case of Metropolitan Life Ins. Co. v. Williams, 180 Miss. 894, 178 So. 477, decided in 1938, eighteen years subsequent to the Hood case, there the deceased, Williams, who was suffering with a diabetic condition, received a scratch on his arm, which in turn aggravated his diabetic condition, causing blood poisoning and death. In deciding in favor of the beneficiary of Williams, we cited the Hood case in refusing to allow the insurance company's contention that the injury received by Williams did not arise ''directly and independently of all other causes by violent and accidental means.'' In the Williams case we quoted from Hood and said, among other things:

''It appears clearly from the testimony of Dr. Gamble that the active cause of the death was the accident and that the accident precipitated the other troubles; that,

had the accident not occurred, death would not have resulted for some years.''

We then faced the first question to be determined:

''Does the provision of the policy 'the effects resulting directly and exclusively of all other causes from bodily injury sustained during the life of this policy solely through accidental means', mean that there can be no recovery if there is a latent or dormant disease which becomes active through the agency of the accident, and cooperates with the other effects of the accident in bringing about the death?''

And then, we answered the question, again quoting the answer which we had stated in Hood, to-wit:

''We think that, if the accident is the proximate cause of the death and sets in motion or starts a latent or dormant disease, and such disease merely contributes to the death after being so precipitated by the accident, it'' (meaning the disease) ''is not a proximate cause of death nor a contributing cause within the meaning of the terms of the policy.''

Hood and Williams are both cited in 45 C. J. S., p. 813, and we find therein this language:

''* * * where the death or disability results from an accidental injury aggravating or rendering active a dormant disease or infirmity, it will be regarded as being caused solely by the injury, so as to render insurer liable therefor, even though the death or disability might have resulted at a later period regardless of the injury, and even though the accident would not have had such an effect on a normal person.''

Also, in 45 C. J. S., p. 812, we find the following language:

''* * * So, also, if death or disability results from the accident, the fact that but for weakness or infirmities produced by former illness or disease it might not have been fatal or as severe will not prevent a recovery.''

This rule or interpretation has been construed re-

peatedly and there are numerous decisions in which we have reaffirmed this basic rule of law with reference to these particular provisions in an accident insurance policy. See Equitable Life Assur. Soc. of United States v. Askew, 11 So. 2d 441; Standard Life Ins. Co. v. Foster, 210 Miss. 242, 49 So. 2d 391; New York Life Ins. Co. v. Schlatter, 203 F. 2d 184, affirmed by the Fifth Circuit Court of Appeals in 1953; Mutual Life Ins. Co. of New York v. Rather, 221 Miss. 527, 73 So. 2d 163. Appellee submits that the interpretation in the Hood case has been adopted in other jurisdictions, citing Freeman v. Mercantile Mutual Accident Association, 156 Mass. 351, 17 L. R. A. 753, and Fidelity & Casualty Co. v. Meyer, 106 Ark. 91, 152 S. W. 995, 44 L. R. A. (N.S.) 493.

Insofar as the appellant's contention is concerned, that since the disease contributed to the death of the insured the appellant is not liable, we fail to find anything in the appellant's policy which would take it out from under the rule of the proximate and remote causes as set forth in the Hood, Williams, Askew, Foster, and Schlatter cases. The late Justice Edwin R. Holmes of the Fifth Circuit Court of Appeals wrote a concurring opinion in the case of New York Life Ins. Co. v. Schlatter, supra, stating:

"In case of doubt or ambiguity in the language of an insurance policy, that interpretation should be given which favors the insured rather than the insurer. An injury that might naturally produce death to a person of a certain age or state of health is the cause of his death, if he dies by reason of it, even if he would not have died if his age of previous health had been different."

There are numbers of cases which hold to the contrary but the Justice said that he thought that the Hood case adopted the true rule and that the Mississippi court

had aligned itself with those jurisdictions which apply the rule of proximate cause to insurance policies.

■■■ The Mississippi law and the terms of the policy in the instant case do not require the court or the jury to consider the cause of causes. It would be impossible to do so. As Bacon says, "if it were infinite with the law to consider the causes, that would lead us back to the birth of a person, 'for if he had never been born the accident would not have happened.' "

It is the causing of death, not the condition without which the death would not have occurred (the causa causan, not the causa sine cua non), that fixes liability under policy for accident insurance or under the provisions for double indemnity in case of death from bodily injury effected solely through violent and accidental means.

It is apparent that this case must be decided in harmony with the Hood case and the Mutual Life Insurance Co. of New York v. Smith, supra (Feb. 10, 1964), and it is easily distinguishable from the Sharon case, supra. Therefore, we abide by the basic proposition established in the Hood case, namely: If the accident, which the jury found to be true in the case at bar, is a proximate cause of death, if in turn it sets in motion a train of events leading directly to death, then the death results from the accident. This is true even though the state of health of the insured is delicate so that he is killed by injuries that probably would not have been fatal to one in normal health. This rule can be applied to all cases without reaching the unreasonable conclusions which appellant urges the application of this rule would dictate. We see no valid reason for disturbing the decision in the Hood case which this Court established more than four decades ago. It was a landmark case then, has become one in other jurisdictions and we prefer not to destroy it now. Accident policies are still being sold with resultant profits, and the insured have not

been denied their protection, when an accident was the proximate cause of their injuries, for which the policy was purchased.

■■ ■ We conclude that the appellant was not entitled to a peremptory instruction when the appellee had introduced her evidence, or after both sides had rested, and we fail to find any merit for reversal in the other errors assigned by the appellant. ■■ ■ If the appellant was dissatisfied with the juror C. V. Dyess who, after the plaintiff had completed his case, suddenly stated in open court that he had erroneously advised that he had not formed an opinion, it should have made a motion for a mistrial. However, the appellant preferred to gamble and simply lost.

Reviewing all of the instructions which were granted to both appellant and appellee, we feel that the jury was properly instructed under the facts and the law as applied under our Mississippi interpretation.

The jury resolved the issues of fact in favor of the appellant and under the well established authorities, which are numerous, and in the absence of bias or prejudice on the part of the jury. We therefore conclude that the verdict of the jury must be affirmed. See St. Louis & S. F. R. Company v. Moore, 101 Miss. 768, 58 So. 471, 39 L. R. A., (N. S.) 978; Sansing v. Thomas, 211 Miss. 727, 52 So. 2d 478; Kelly v. State, 239 Miss. 705, 124 So. 2d 844; Y. D. Lumber Co., Inc. v. Aycock, 40 So. 2d 551 (Miss. 1949); Magnolia Textiles, Inc. v. Gillis, 206 Miss. 797, 41 So. 2d 6; Westbrook v. Corneil, 199 Miss. 118, 23 So. 2d 753.

For the foregoing reasons, the verdict of the jury and the judgment for the appellee is affirmed.

Affirmed.

*Lee, C. J., and Gillespie, McElroy and Rodgers, JJ.,* concur.